# Exhibit A

**KERRY L. ARMSTRONG** (CA SBN: 196105)
Law Offices of Kerry L. Armstrong, APLC
750 B Street, Suite 2820
San Diego, CA 92101
Tel: (619) 234-2300
Fax: (619) 491-0722
E-mail: notguilty01@outlook.com

**Attorney for Defendant
THEODORE E. ESSENFELD**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JUDGE ROBERT S. HUIE)

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CASE NO.: 23-CR-0177-RSH |
| Plaintiff, | NOTICE OF MOTIONS AND MOTIONS TO: |
| vs. | |
| **THEODORE E. ESSENFELD,** | 1) DISMISS COUNTS ONE AND TWO OF THE SUPERSEDING INDICTMENT |
| Defendant, | |
| | Date: March 22, 2024 |
| | Time: 2:00 p.m. |

**TO: TARA K. MCGRATH, UNITED STATES ATTORNEY; AND SABRINA L. FEVE, ASSISTANT UNITED STATES ATTORNEY:**

PLEASE TAKE NOTICE that on March 22, 2024, at 2:00 p.m., or as soon thereafter as counsel may be heard, the defendant, THEODORE E. ESSENFELD, through his counsel, Kerry L. Armstrong, will bring the following motions:

## MOTIONS

The defendant, THEODORE E. ESSENFELD, by and through his counsel, Kerry L. Armstrong, hereby moves this court to dismiss counts one and two of the superseding indictment.

1

These motions are based upon the instant motions and notice of motions, the attached statement of facts and points and authorities in support of these motions, and any and all matters that may come to the court's attention prior to or at the time of the hearing of these motions.

Dated: February 26, 2024

Respectfully submitted,

*s/ KERRY L. ARMSTRONG*
KERRY L. ARMSTRONG
Attorney for Defendant
THEODORE E. ESSENFELD

KERRY L. ARMSTRONG
Law Offices of Kerry L. Armstrong, APLC
750 B Street, Suite 2820
San Diego, CA 92101
Telephone: (619) 234.2300
Fax: (619) 491.0722
Email: NotGuilty01@outlook.com
CA STATE BAR NO: 196105

**Attorney for Defendant**
**THEODORE E. ESSENFELD**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JUDGE ROBERT S. HUIE)

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> **THEODORE E. ESSENFELD**, <br><br> Defendant. | CASE #: 23-CR-0177-RSH <br><br> **MEMORANDUM OF LAW SUPPORTING DEFENDANT'S MOTION TO DISMISS COUNTS ONE AND TWO OF THE SUPERCEDING INDICTMENT** |

TO: TARA K. McGRATH, UNITED STATES ATTORNEY; AND SABRINA L. FEVE, ASSISTANT UNITED STATES ATTORNEY:

 The defendant in this case, THEODORE E. ESSENFELD, by and through his attorney, KERRY L. ARMSTRONG, hereby submits his Memorandum of Points and Authorities in support of his Motion to Dismiss Both Counts of the Superceding Indictment:

**I.**

**STATEMENT OF THE CASE**

 Mr. Essenfeld is charged with violating two counts of 18 United States Code in a superceding indictment filed on August 10, 2023. Count one alleges that he violated

1 18 U.S.C. §2261A, subdivision (2)(B) (cyberstalking). Count two alleges that he
2 violated 18 U.S.C. §1028, subdivision (a)(7) (identity theft). There is also a forfeiture
3 allegation filed against Mr. Essenfeld under 18 U.S.C. §982 and §1028.

## II.

## STATEMENT OF FACTS

Mr. Essenfeld is a captain in the United States Navy. Around April 2018, Mr. Essenfeld and alleged victim ▓ met on the dating site Match.com. By June 2018, the two began to date exclusively.

In January 2020, Mr. Essenfeld was ordered by the Navy to move from San Diego to Colorado for military duties. ▓ remained living in San Diego. The two had several relationship issues, and there were many discussions between them regarding their future together. ▓ eventually moved to Colorado in May 2021 to live with Mr. Essenfeld. However, the two broke up for good in August 2021 and never reconciled.

In February 2022, R.Z.'s brother-in-law, ▓, was on Facebook and received a "friend suggestion" from someone with the name of ▓ (spelled out).[1] ▓ viewed the Facebook page seemingly belonging to ▓ and he noticed multiple photos on the page that he believed were "inappropriate." ▓ then notified ▓ about the Facebook page.

▓ attempted to view the Facebook page from her "real" Facebook account, but she could not because she was blocked from the "fake" Facebook page containing her name and photographs. (She soon learned that several of her family members were also blocked from the fake Facebook page.) ▓ then created a false Facebook page so she could use that to access the fake ▓ Facebook account, which she was then able to view.

Once ▓ was able to view the fake Facebook page, she saw about fifty photos

---

[1] In another part of the discovery, it states that ▓ first saw the Facebook page in December 2021.

-2-

of herself on it. She recognized that some of the photos were apparently taken from her sister's Facebook page and some from her own Instagram page. Of the approximate fifty photos on the page, around eleven of them were of ▮▮ in a ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Those photos were taken of her while she was engaged in a dance competition that she described as a "semi-public" event where persons could take photos of the participants. However, ▮▮ knew that the photos on the fake Facebook page depicting her while dancing at the competition were taken by a professional photographer and then purchased by her, and that she had later shared these photos with Mr. Essenfeld.

▮▮ later clarified that the photos were from an event in October 2019 hosted by ▮▮▮▮▮▮▮ where about fifty ▮▮ dancers had competed in front of around 150 patrons who had paid $35 each to enter the event. She also admitted that anyone in attendance could take photos of the competition, and no one was made to sign a permission form or a non-disclosure form.

In addition to the above photos of ▮▮▮▮▮ while she was competing at a ▮▮ event, the fake Facebook page also depicted old photos of her in military uniform when she was still in the U.S. Navy.[2] ▮▮ was not happy that photos of her previous military service were being shown on the fake Facebook page alongside photos of her in ▮▮▮▮▮▮▮▮ from her ▮▮▮▮▮▮ competitions.

Also on the fake Facebook page were screen shots of ▮▮'s online conversations through Match.com which were from approximately October 2020. ▮▮ had posted a dating ad on that website in 2020 while she and Mr. Essenfeld were still dating; however, he was living in Colorado at the time due to military orders. ▮▮ had been conversing online ▮▮▮▮▮▮▮▮▮▮ on Match.com around October 2020, and in February or March 2022, ▮▮ saw the screen shots from those conversations on the fake Facebook page.

---

[2] ▮▮ was no longer in the U.S. Navy when she met Mr. Essenfeld in 2018.

-3-

1    The fake Facebook page also contained a headline entitled ▮▮▮▮
2 ▮▮▮▮  Under that, it stated, ▮▮▮▮
3 ▮▮▮▮                                                                        Another photo
4 displayed on that same account showed ▮▮ kissing the cheek of a man[3] dressed in a
5 military uniform at what appears to be a military ball.  The man's face is blurred out.
6 Under ▮▮ name by the photo, it states, ▮▮▮▮
7 ▮▮▮▮

8    ▮▮ suspected that Mr. Essenfeld was the person who had posted the screen
9 shots on the page because when she checked the email address associated with one of
10 the Match.com gentlemen, she saw that the displayed phone number digits on the
11 "forgot password" page matched Mr. Essenfeld's personal cell number.[4]

12   Around the same time in February 2022 that ▮▮ found the fake Facebook page,
13 she also found a "fake" LinkedIn page with her name and information on it.  The page
14 contained a photo of her, and it described her as an ▮▮▮▮
15 The LinkedIn page "followed" her place of work, and it listed her previous military
16 service.  ▮▮ requested that LinkedIn delete the page, and the company complied.

17   Around March 18, 2022, ▮▮ reported to a special agent at the U.S. Army
18 Criminal Investigations Division that she had found the above-mentioned Facebook
19 account with her photos on it that she had not created. ▮▮ explained to the agent that
20 the fake page contained photos of her in ▮▮▮▮.  She
21 stated that she believed Mr. Essenfeld had posted the photos because they were sent
22 only to him while the two had previously dated.

23   The special agent asked ▮▮ if she had any safety concerns about Mr. Essenfeld,
24 and she stated that she did not.  However, she was concerned that her cell phone

---

[3] This man is believed to be Mr. Essenfeld.

[4] Only three of the phone number's seven digits were displayed on this "forgot password" page, but those three numbers did match Mr. Essenfeld's phone number.

-4-

1 number was displayed on the fake Facebook page, as well as her hometown, current
2 city of residence, and at one point her date of birth.  She also was concerned that the
3 creator of the fake page had "liked" her place of work, thereby allowing her workplace
4 coworkers and boss to possibly be able to view the photographs of her while ▓▓▓▓
5 ▓▓▓▓▓▓▓.

6       During a later interview on April 14, 2022, ▓▓▓ stated that some of her family
7 members, old work associates, childhood associates, and ▓▓▓▓▓▓▓ associates had
8 either seen or had "friended on" the fake Facebook page. ▓▓▓ claimed that the fake
9 online accounts had caused her embarrassment and anxiety, and that she had lost a few
10 days of work due to the situation.  She stated that she felt her reputation had been
11 harmed due to the accounts.

12       The Army special agent then attempted to forward the case to NCIS for further
13 investigation.  However, on March 21, 2022, after consulting with a lieutenant trial
14 counsel with the Navy, the special agent was told that the case did not meet the
15 threshold for an NCIS investigation and that no federal statutes applied.  The case was
16 then closed out.  But on March 30, 2022, Captain Brian Lansing, a staff judge advocate
17 with the U.S. Navy, deemed that the above-mentioned conduct did indeed constitute
18 a violation of federal law.  The case was then reopened and further investigation began.

19       Because ▓▓▓ believed that the creator of the Facebook account and LinkedIn
20 account was Mr. Essenfeld, the investigation quickly centered around him.  NCIS
21 began interviewing various witnesses, as well as issuing numerous subpoenas for Mr.
22 Essenfeld's email accounts, phone records, IP addresses, etc.

23       On July 25, 2022, Mr. Essenfeld was interviewed by NCIS agents in San Diego.
24 Prior to questioning, Mr. Essenfeld was read his Article 31(b) rights, which are similar
25 to the *Miranda* warnings/advisements.  Mr. Essenfeld agreed to waive his rights, and
26 he signed an acknowledgment stating such.  At first, Mr. Essenfeld denied creating the
27 fake Facebook account and LinkedIn account.  However, he eventually admitted to
28 creating them, stating that he had done so because R.Z. had cheated on him.  He added

1 that he had merely wanted to hurt her feelings, but that his actions were immature and
2 irrational. He stated that he regretted creating the pages. He also stated that it was
3 never his intent to break the law; rather, he was just "lashing out in a bitter way."

It was eventually learned, mostly through subpoenas and search warrants, that Mr. Essenfeld had used ▆▆▆'s name and date of birth to create the fake Facebook account, the fake LinkedIn account, fake Yahoo email accounts linked to those two accounts, and a disposable cell phone account in ▆▆▆'s name that was linked to the Facebook and LinkedIn accounts.

## II.

### THE COURT MUST DISMISS COUNT ONE BECAUSE IT VIOLATES MR. ESSENFELD'S FREEDOM OF SPEECH AS APPLIED IN THIS CASE

Mr. Essenfeld in charged in count one of the superceding indictment with cyberstalking in violation of 18 U.S.C. §2261A, subdivision (2)(B). That section states:

> Whoever–
>
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that--
>
> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i),[5] (ii), or (iii) of paragraph (1)(A), shall be punished as provided in §2261(b) or §2261B, as the case may be.

Mr. Essenfeld urges this court to now dismiss count one of the superceding indictment based on the fact that his conduct in this case is protected under the First

---

[5] In Mr. Essenfeld's particular case, the government is almost certainly proceeding under a theory that the "substantial emotional distress" was caused directly to the alleged victim in this case, ▆▆▆ (and not her immediate family member, her spouse or intimate partner, or her pet or emotional support animal.

-6-

Amendment to the United States Constitution.  As such, his conduct cannot be punished as "cyberstalking" under 18 U.S.C. §2261A, subdivision (2)(B) (or any other federal law for that matter).

The First Amendment to the United States Constitution states that "Congress shall make no law...abridging the freedom of speech."  "Generally speaking, the First Amendment forbids the government from restricting speech because of its content." (*United States v. Hobgood* (8th Cir., 2017) 868 F. 3d 744, 747, *quoting United States v. Stevens* (2010) 559 U.S. 460, 468.)  "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (*Stevens, supra,* at 468, *quoting Ashcroft v. American Civil Liberties Union* (2002) 535 U.S. 564, 573.)  "The Free Speech Clause protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful." (*United States v. Sryniawski* (8th Cir., 2022) 48 F. 4th 583, 587.)

It is true that some content-based speech restrictions are permitted under the First Amendment, but only in a "few limited areas." (*Stevens, supra,* at 468; *see also Counterman v. Colorado* (2023) 600 U.S. 66, 73.)  In fact, such restrictions must be for "well-defined and narrowly limited classes of speech." (*Stevens, supra,* at 468-469.)  "When the government seeks to punish speech based on its content, the First Amendment typically imposes stringent requirements. This ensures that the government, even when pursuing compelling objectives, does not unduly burden our Nation's commitment to free expression." (*Counterman, supra,* at 83, *concurring opinion of Justice Sotomayor*.)

In Mr. Essenfeld's case, it is assumed that the government is proceeding on a theory that he intended to harass and/or intimidate ▮▮▮ and that his actions constituted a course of conduct that would be reasonably expected to cause substantial emotional

1  distress to ▓.[6]  Therefore, there seem to be three things that the government must
2  prove in order to convict Mr. Essenfeld: 1) prove that he *acted* by using the mail or the
3  internet to engage in a course of conduct, 2) prove that he acted with the *intent* to
4  harass or intimidate ▓ and 3) prove that Mr. Essenfeld's *actions* caused an
5  emotional response in ▓ by causing, attempting to cause, or reasonably expecting
6  to cause substantial emotional distress to her.

7      There is often a fine line between protected free speech and harassing speech
8  that crosses into criminality.  For instance, the U.S. Supreme Court has upheld citizens'
9  rights to hold up signs at a military funeral stating, "Thank God for dead soldiers,"
10 "God hates fags," and "You're going to hell." (*Snyder v. Phelps* (2011) 562 U.S. 443.
11 The Supreme Court has also held unconstitutional a criminal ordinance that prohibited
12 the burning of crosses and the display of Nazi swastikas that the persons committing
13 such acts would have reasonable grounds to know would arouse anger or resentment
14 in others based on their race, religion, or gender. (*R.A.V. v. City of St. Paul* (1992) 505
15 U.S. 377.) And the Supreme Court has held that a parody depicting the Reverend Jerry
16 Falwell Sr. having drunken sex with his mother in an outhouse was protected by the
17 First Amendment even if it was intended to cause emotional distress to Reverend
18 Falwell Jr.. (*Hustler Magazine, Inc. v. Falwell* (1988) 485 U.S. 46.)

19     The facts most favorable to the government show that Mr. Essenfeld never
20 threatened ▓ whatsoever, never followed her or set up surveillance tracking her
21 whereabouts, and never used any form of violence toward her.  In fact, the two had
22 very little communication with each other after their breakup, and that little
23 communication was completely cordial.

24     In some instances, 18 U.S.C. §2261A attempts to restrict speech that is protected
25 by the First Amendment.  In those cases, it must be found to be unconstitutional as

---

[6] There is simply zero evidence that Mr. Essenfeld ever intended to injure or kill ▓., or that he ever intended to place her under surveillance.

-8-

1  applied. (*See, for example, United States v. Cassidy* (D. Md., 2011) 814 F. Supp. 2d
2  574; *United States v. Alvarez* (9th Cir., 2010) 617 F. 3d 1198.) In an as-applied
3  challenge, the court asks whether a law with some permissible uses "is nonetheless
4  unconstitutional as applied to appellant's activity." (*Spence v. Washington* (1974) 418
5  U.S. 405, 414; *see also Street v. New York* (1969) 394 U.S. 576, 594.)

6        Here, the prosecution of Mr. Essenfeld unconstitutionally restricts his freedom
7  of expression because of his message. That is, Mr. Essenfeld posted true statements
8  about ▮ on Facebook and LinkedIn. While it is true that he concealed his identity
9  when posting the subject matter and did so without ▮'s consent, nothing he posted
10 was falsely created or was a lie about ▮ Even the content on the Facebook page
11 regarding R.Z. cheating on Mr. Essenfeld while he was stationed in another state was
12 absolutely true. In fact, ▮▮▮▮▮▮▮▮▮ to the Army and NCIS investigators.
13 While Mr. Essenfeld's conduct in this case was immature and in poor taste, that does
14 not convert his constitutionally-protected speech into a federal crime.

15       While some of ▮'s photos that Mr. Essenfeld posted to the "fake" Facebook
16 account that he had created were of ▮ in ▮ outfits while she engaged in ▮
17 ▮, those were photos taken of her at a public event/contest where many people
18 saw her wearing such clothing. These patrons were even allowed to photograph the
19 ▮ at the competition. No "obscene" photos of ▮ were ever posted on
20 Facebook that were accessible to the general public or to any of the "friends" who had
21 become linked to the fake Facebook page. As such, Mr. Essenfeld's posting of the
22 content on the Facebook page and LinkedIn account is protected speech and not
23 subject to restriction.

24       Mr. Essenfeld's posting of the content described above cannot be considered to
25 be integral to any criminal conduct, which is an exception to freedom of speech under
26 the First Amendment. In *United States v. Petrovic* (8th Cir., 2012) 701 F. 3d 849, the
27 Eighth Circuit upheld a §2261A conviction after finding that the speech at issue was
28 integral to the defendant's extortion conviction under 18 U.S.C. §875, subdivision (d).

1    Here, the other charge that Mr. Essenfeld is charged with is identity theft
2 pursuant to 18 U.S.C. §1028, subdivision (a)(7). It is true that the identity theft charge
3 relates to ▇ in that Mr. Essenfeld is accused of illegally using ▇'s name and date
4 of birth to falsely create the Facebook and LinkedIn accounts. However, none of the
5 content that Mr. Essenfeld posted relating to ▇., i.e., his "speech," is integral to a
6 conviction for identity theft. Those are two very different things. Therefore, the
7 exception under *Petrovic* does not apply to Mr. Essenfeld's case.
8    Also in *Petrovic,* the Eighth Circuit weighed the issue of whether in "extreme
9 cases," it is constitutionally permissible to regulate the public disclosure of facts about
10 private individuals. (*Id.* at 855, *citing Coplin v. Fairfield Pub. Access Television
11 Comm.* (8th Cir., 1997) 111 F. 3d 1395, 1404.) The Eighth Circuit in *Coplin* had held
12 that in the absence of a compelling state interest, such speech may be subject to
13 regulation only if: 1) any such regulation is viewpoint neutral, 2) the facts revealed are
14 not already in the public domain, 3) the facts revealed about the otherwise private
15 individual are not a legitimate source of public interest, and 4) the facts revealed are
16 highly offensive. (*Id.* at 1405.) To survive constitutional scrutiny, the governmental
17 regulation must satisfy all four of the above requirements.
18    Mr. Essenfeld's case is not an "extreme" case by any stretch of the imagination.
19 While the Eighth Circuit found §2261A to be viewpoint neutral in *Petrovic,* the other
20 factors in Mr. Essenfeld's case render it very distinguishable from cases such as
21 *Petrovic*. In that case, the defendant revealed intimately private facts and photographs
22 of the victim engaged in explicit sexual activity (including him previously filming the
23 two with a hidden camera performing various sex acts together). (*Id.* at 852.) Petrovic
24 had publicly also revealed text messages from the victim where she had written about
25 sexual abuse she had suffered as a child, suicidal thoughts she previously had, and
26 various family secrets. (*Id.*) The court found such information had not been in the
27 public domain, and it also found the information highly offensive.
28    Here, the only photos and/or videos of ▇ engaging in sexual activity were

1 posted to the private folder on the fake Facebook page that Mr. Essenfeld created.
2 There is no proof whatsoever that anyone but Mr. Essenfeld was ever able to access
3 that folder. Moreover, the photos and videos that Mr. Essenfeld posted of ▮▮ while
4 she was ▮▮▮▮▮ were of her at semi-public events where persons who had
5 purchased tickets could enter, watch, and even take photos if they wanted. This was
6 not a scenario where ▮▮ was ▮▮▮▮▮ just for Mr. Essenfeld at their residence
7 or another private place, thereby making the public displaying of such conduct much
8 more embarrassing. While ▮▮ indeed might have been somewhat embarrassed when
9 she learned that her ▮▮▮▮▮ photos and videos had been posted on a Facebook
10 and LinkedIn page, it cannot be said that the information was "highly offensive" as the
11 videos in *Petrovic* definitely were.

12     In sum, under the factors set forth in *Petrovic, supra,* the government in Mr.
13 Essenfeld's case fails on at least two of the factors ("the facts revealed are not already
14 in the public domain," and "the facts revealed are highly offensive"). As such, the
15 restriction on speech present in Mr. Essenfeld's case violates his First Amendment
16 rights.

17     As stated previously, it is believed that the government in this case is proceeding
18 on a theory that Mr. Essenfeld's speech (i.e., the posting of the content on the LinkedIn
19 page and especially the Facebook page) harassed and/or intimidated ▮▮ and that his
20 speech caused, attempted to cause, or would be reasonably expected to cause
21 substantial emotional distress to her. Again, there is often a fine line between protected
22 free speech and harassing speech that crosses into criminality. Therefore, a more
23 detailed look into what constitutes harassment and intimidation is in order.

24 **A. "Harassment" and "Substantial Emotional Distress":**

25     In *Adams v. Ford Motor Co.* (3d Cir., 2011) 653 F.3d 299, 307, the Third
26 Circuit looked to Black's Dictionary to determine the definition of "harassment." The
27 2009 version of that dictionary defined harassment as "words, conduct, or action (usu.
28 repeated or persistent) that, being directed at a specific person, annoys, alarms, or

-11-

1 causes substantial emotional distress in that person and serves no legitimate purpose..."

2 As for what "substantial emotional distress" means, the Tenth Circuit in *Veile
3 v. Martinson* (10th Cir., 2001) 258 F. 3d 1180 stated that it is "understood by persons
4 of common intelligence" to mean "mental distress, mental suffering, or mental anguish,
5 and includes depression, dejection, shame, humiliation, mortification, shock, indignity,
6 embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness,
7 as well as physical pain." (*Id.* at 1189.)

8 Reported cases from several Courts of Appeal across the United States show that
9 harassment cases under §2261A where the convictions have been upheld have
10 contained much worse conduct than Mr. Essenfeld's in his particular case. For
11 instance, in *United States v. Osinger* (9th Cir., 2014) 753 F. 3d 939, the Ninth Circuit
12 was faced with several legal challenges to §2261A, subdivision (2)(A). The defendant
13 argued on appeal that the statute was vague regarding the terms "harassment,"
14 "intimidation," and "substantial emotional distress." He also argued that the statute
15 was unconstitutional as applied to the facts of his case, as the First Amendment
16 protected his speech in the case. However, the Ninth Circuit upheld the convictions in
17 *Osinger,* holding that the statute was not vague and did not violate the First
18 Amendment. (*Id.* at 947-948.)

19 It should be noted that Mr. Osinger's conduct was much worse than what Mr.
20 Essenfeld did in this case. In *Osinger,* the defendant's girlfriend (V.B.) broke up with
21 him when she found that he was still married to his wife. V.B. moved out and did not
22 give Osinger her new address. However, he found her and knocked on her window at
23 1 or 2am. He also went to her workplace a few times. V.B. then moved in with her
24 sister, and Osinger continued to call and text V.B. He also eventually came by V.B.'s
25 sister's house. V.B. told Osinger that she did not want to be with him anymore. She
26 then moved from Illinois to California and did not give him her new, forwarding
27 address. (*Id.* at 941.)

28 Once V.B. arrived in California, Osinger continued to text her. (*Id.* at 941.) He

-12-

1  also told her that he was going to move to California as well. V.B. told him to stop
2  texting and calling her, but he persisted. She received forty texts from him in just two
3  days. (*Id.* at 952.) Some of Osinger's texts to V.B. including him hinting that he
4  possessed sexually explicit videos of her. V.B. took that as a threat. V.B. then
5  received a phone call from an ex-boyfriend who told her that someone had posted a
6  Facebook page of her with "nude pictures" of her and "horrible content." (*Id.* at 942.)

7        When V.B. viewed the Facebook page, she saw that the photos were nude ones
8  of her taken by Osinger. (*Id.* at 942.) Osinger had organized the the photos into two
9  folders on the Facebook page labeled "WHORE" and "WHORE2." Some of the
10 photos showed her bottomless, other photos showed her masturbating, and some even
11 showed her performing oral sex. (*Id.* at 952.) V.B. also soon learned that a co-
12 employee and an ex-coworker had received nude photos of her via email. (*Id.* at 942.)
13 Osinger also sent "friend requests" from the page to V.B.'s family members and friends
14 encouraging them to view the page. (*Id.* at 952.) V.B. testified at trial, "I was scared.
15 I did not know what else he was going to try to do." (*Id.* at 952.)

16       As stated above, the Ninth Circuit upheld Osinger's conviction for cyberstalking.
17 It held that Osinger's speech was not constitutionally protected under the First
18 Amendment because "Osinger was unrelenting in his pursuit and harassment of her
19 [V.B.]" (*Id.* at 947.) That harassment included sending V.B. threatening text
20 messages, as well as designing a fake Facebook page with nude photos of V.B. on it.
21 The Court also noted Osinger's actions in sending nude photos of V.B. to her friends.
22 (*Id.*)

23       While Mr. Essenfeld's conduct in this case was inexcusable, peurile, and
24 immature, it did not come close to being "harassing." Much different from almost
25 every published case where the conduct under §2261A was upheld as criminal after a
26 First Amendment objection, Mr. Essenfeld never sent multiple texts, phone calls, or
27 emails to his alleged victim. In fact, he never contacted her at all once they ceased
28 dating. While he did create a fake Facebook page and LinkedIn page with ▮▮▮▮'s

1 photos on them, Mr. Essenfeld never placed nude photos of ▮ on either page.[7]
2 Unlike the defendant in *Osinger*, Mr. Essenfeld never sent the explicit photos and
3 videos he had of ▮ to anyone, including none of her family members or friends. In
4 fact, Mr. Essenfeld was careful to block ▮'s close family members from even seeing
5 the fake Facebook page after he created it.

6 While it is true that ▮ told the special agents investigating the case that she
7 had suffered embarrassment and anxiety from learning of the fake Facebook page, and
8 that she had lost a few days of work due to the anxiety, that does not rise to the level
9 of "substantial emotional distress." If being embarrassed and feeling anxious from
10 another person's speech was enough to constitute a federal crime, then the U.S.
11 Attorney's Offices around America would be burdened from thousands of prosecutions
12 and the prisons across this country would be full of felons. While Mr. Essenfeld's
13 conduct and speech was tasteless and juvenile, he had no intent to cause ▮
14 substantial emotional distress. And most reasonable persons would fail to believe that
15 such conduct and speech would reasonably be expected to cause substantial emotional
16 distress. Mr. Essenfeld definitely did not believe that his conduct and speech would
17 lead to that on the part of ▮.

**B. "Intimidation":**

19 The other theory under §2261A(2)(B) that the government might possibly be
20 proceeding with in its prosecution of Mr. Essenfeld is "intimidation." However, this
21 court should quickly dismiss this theory if the government indeed argues it, as there is
22 no proof whatsoever that Mr. Essenfeld ever attempted to intimidate, or actually
23 intimidated, R.Z.

24 The Cambridge Dictionary states that "intimidation" means "the action of

---

[7] Again, he did place several explicit videos and photos on the Facebook page under a folder entitled "Bedroom Fun." However, that folder was absolutely not accessible to anyone but Mr. Essenfeld. He placed that material in a folder on Facebook so that his underage son would not find them on his (Essenfeld's) laptop when his son used it for homework.

-14-

1  frightening or threatening someone, usually in order to persuade them to do something
2  that you want them to do." Dictionary.com defines intimidation as "the act of inducing
3  fear or awe." Finally, the Merriam-Webster Dictionary defines "intimidate" as "to
4  make timid or fearful."

5  Clearly, none of Mr. Essenfeld's conduct or speech in this case equates to
6  intimidation. Again, Mr. Essenfeld and ▮ had very minimal contact with each other
7  after the two broke up, but that contact was cordial between the two. It would
8  seemingly be near-impossible to intimidate someone if there is only minimal contact
9  between the victim and the person doing the intimidating. Not only did Mr. Essenfeld
10 not intimidate ▮ during the time he had the Facebook page up, but he made sure to
11 block her from the page so that she did not even know about it. As such, there was no
12 intimidation whatsoever on his part.

### III.

#### THE COURT MUST DISMISS COUNT TWO BECAUSE HE CAN ONLY BE PROSECUTED FOR IDENTITY THEFT IF COUNT ONE IS UPHELD

16 Mr. Essenfeld is charged in count two of the superceding indictment with
17 violating 18 U.S.C. §1028, subdivision (a)(7) (identity theft). The government alleges
18 that Mr. Essenfeld used ▮'s name and date of birth to create the fake Facebook and
19 LinkedIn accounts in her name (as well as some email accounts and a cell phone
20 account to help create and verify the Facebook and LinkedIn accounts). Therefore, the
21 government alleges, Mr. Essenfeld used ▮'s means of identification in order to
22 commit the crime of cyberstalking (as charged in count one of the superceding
23 indictment).

24 18 U.S.C. §1028, subdivision (a)(7), states:

> (a) Whoever, in a circumstance described in subsection (c) of this section–
>
> (7) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a

-15-

|   |   |
|---|---|
| 1 | violation of Federal law, or that constitutes a felony under any applicable State or local law. |
| 2 | |

While §1028, subdivision (c), has several scenarios that the government can proceed under relevant to a prosecution for identify theft, the one that makes the most sense in Mr. Essenfeld's case is §1028, subdivision (c)(3)(A). That section states in relevant part:

> (c) The circumstance referred to in subsection (a) is that–
>
> (3)(A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce...

This court should now dismiss count two of the superceding indictment if it in fact dismisses count one (as argued above in this motion). That is because, as noted in the superceding indictment, the identity theft as charged here relates solely to count one. And under §1028, subdivision (a)(7), it is only a violation of that §1028 statute if the use of someone else's "means of identification" was done with the intent to commit, or in connection with, the crime of cyberstalking. Put in another way, if count one falls in this case, then count two must fall as well. And because the crime of cyberstalking fails in this case under the First Amendment, there is nothing for count two to "attach" to.

This is not a case where Mr. Essenfeld used the name and date of birth of ▮ in order to order a credit card in her name that he could use, use her identity in order to set up fake bank accounts that he could then deplete, or buy items or property in her name. Rather, he only used her name and date of birth to set up a Facebook page in her name and a LinkedIn account in her name so that he could then expose her cheating to whoever may come across those pages. While such conduct may indeed be unethical, it was not illegal because Mr. Essenfeld's freedom of speech precludes him from being convicted of cyberstalking under the particular facts of this case. As such, count two must now be dismissed.

## CONCLUSION

-16-

For the reasons stated above, the defendant, THEODORE E. ESSENFELD, by and through his attorney, KERRY L. ARMSTRONG, respectfully requests that the court grant his Motion to Dismiss Both Counts of the Superceding Indictment.

DATED: February 26, 2024          Respectfully Submitted,

       s/ Kerry L. Armstrong
**KERRY L. ARMSTRONG**
**Attorney for Defendant**
**THEODORE E. ESSENFELD**